Davidson *v.* Davidson, Appellant.

Argued November 12, 1959. Before GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ. (RHODES, P. J., and HIRT, J., absent).

*Ruth F. Cooper*, with her *Dane Critchfield*, for appellant.

*Harold Gondelman*, with him *J. B. Alpern*, for appellee.

OPINION BY ERVIN, J., December 17, 1959:

This appeal relates to an action in divorce instituted by the husband against the wife on the grounds of indignities and desertion. The master recommended that the divorce be granted on both grounds. Exceptions were dismissed by the court below and the master's recommendation was approved. The final decree was entered on July 8, 1959, whereupon the wife appealed to this Court.

It would serve no useful purpose to set forth in detail the testimony, spread over 833 typewritten pages, taken on seven days of hearings before the master. We have carefully examined, as we are required to do, all of this testimony and we are of the opinion that the decree of the court below should be sustained upon the charge of indignities to the person. It will, therefore, be unnecessary for us to consider the charge of desertion.

The parties were married on November 22, 1945 and had one child, Nancy. They lived with the wife's parents for approximately six and one-half months and then lived in a duplex apartment occupied by his parents, which had a separate entrance to their apartment, and about three and one-half years prior to the final separation the parties rented and moved into an apartment in Dormont, Pennsylvania, where they remained until the time of the separation, which occurred on or about July 28, 1953. Thereafter the appellee lived with his parents and the appellant lived at various places but most of the time in Florida, where she had taken Nancy.

The appellee was employed by his father as a meat cutter and worked from about 6:30 a.m. until 6:30 p.m., earning approximately $61.00 per week. He brought his pay home regularly and gave it to his wife and she managed their financial affairs.

After the parties began living in Dormont the wife developed a great antipathy toward the parents of her husband and objected to her husband working for his father or having any contact with his family. The parties visited her parents frequently and were on good terms with them. The wife would not even permit the husband to call his parents on the telephone from his home and when he called them from a pay station outside of the home she went into a tirade and warned him that under no circumstances was he to have any conversation or dealings with his parents. When he suggested visiting his parents, she stated that if he did she would lock the door and not let him in. She would not permit the child, Nancy, to see his parents and when they sent a snow suit as a gift for the child and gifts to him, she threw them down and locked him out of their home so that he had to live in a hotel for three days. She permitted him to return only when he promised not to let his parents send gifts to his home. The

wife was ill on occasions and the husband, after working long hours, would return home, prepare the meal and then sometimes did the laundry. The doing of the laundry was corroborated by Mr. and Mrs. Godleski, who testified that they had seen him doing it on a number of occasions. On one occasion, after she had feigned illness and after he had worked all day and prepared the evening meal and done some painting in the apartment, she wanted him to take her out to the movies. Because he was tired and wanted to get some rest he refused to do it. She then turned the lights on and off, increased the radio volume and television volume, slammed doors and created such a disturbance that he had to retire to the bathroom and lock the door in order to sleep. He slept in the bathroom on three different occasions. At other times, after the arguments with his wife, he had to sleep in the garage. He slept in the garage in his automobile on four or five different occasions. Finally, on or about July 28, 1953, when he called his father from a pay station outside of the apartment for instructions concerning business prior to his father's going on vacation, he returned to the apartment and found his clothes in the hall and the front door locked. His wife yelled: "You are never coming back here" and at her insistence their daughter Nancy told him: "We aren't going to have you for a Daddy any more. We are going to have a new Daddy. I don't want you ever to come around here." When he returned later with his uncle, they found the doors locked and the locks changed so that his key would not open the door. This was the culmination of a long series of arguments and fights between the parties which were largely caused because of the wife's insistence that the husband and their daughter Nancy should not have any contact with his father and mother. The wife subsequently moved out of the Dormont apartment and took all the furniture with her. He con-

tinued to pay the rent until October 1953, when she finally moved out.

The principal contention of the appellant is that this decree in divorce should not be sustained because it depends largely upon the uncorroborated testimony of the husband. A divorce may be granted upon the uncorroborated testimony of the plaintiff unless that testimony is not only contradicted but shaken by the defendant: *D'Alessandro v. D'Alessandro,* 187 Pa. Superior Ct. 194, 197, 144 A. 2d 445. The defendant categorically denied the charges of the plaintiff and blamed the husband's parents for the differences between them. The father of the husband was deceased at the time of the hearings and could not be produced. The mother, though still living, was not produced nor did the husband produce the records of the hotel where he stayed three days after one of the fights. It is the general rule that where a party fails to produce evidence which is within his control and would naturally be in his interest to produce, and he fails to give any satisfactory reason for the omission, the jury has a right to infer that the evidence, if produced, would have been unfavorable to him: *Haas v. Kasnot,* 371 Pa. 580, 584, 92 A. 2d 171. But the inference is permissive, not conclusive: *Sorby v. Three Rivers Motors,* 178 Pa. Superior Ct. 187, 193, 114 A. 2d 347. To permit the unfavorable inference, the record must reveal that the uncalled witness was informed and competent: *Com. v. Black,* 186 Pa. Superior Ct. 160, 164, 142 A. 2d 495. With reference to the hotel records, it should be stated that where the evidence is clearly available to both parties no inference can be drawn against either party for failure to produce the same: *Com. v. Black,* supra. In the present case either party could have subpoenaed the records of the hotel since it was brought out early in the proceedings that the husband had stayed at the hotel. While the mother of the husband might have

been able to give some testimony, most of the trouble
and differences arose in the apartment of the parties
at Dormont when there would have been nobody to cor-
roborate the story of either party except the daughter,
Nancy. The wife on many occasions stated that Nancy
could corroborate her but she failed to produce her
and left her in Miami, Florida. Counsel for the hus-
band offered to pay the expense of having her brought
from Florida to Pennsylvania for the hearings but she
was not produced. It could, therefore, be inferred that
her testimony would not have served the best interest
of the appellant. While the wife categorically denied
all of the charges made by the husband, it cannot be
said that she, by her testimony alone, shook his testi-
mony. The master did not believe her to be a credible
witness and he had good reason for this belief. In the
earlier testimony given by her before the master and
in the hearing before Judge O'BRIEN in the alimony
pendente lite proceedings, she gave false answers as to
her use of an assumed name following her removal to
Florida after the separation of the parties and further
false answers as to her Florida address, the fact of her
employment in Florida and the source of her support.
In that testimony she denied that she had been em-
ployed and asserted that her support had come exclu-
sively from members of her own family, principally
from her father. The testimony was given under oath
by the defendant in her direct examination and cross-
examination. After the conclusion of the testimony in
the hearing one day, defendant's father was subpoenaed
by the plaintiff to appear as a witness in the proceed-
ings the next day and to bring with him such records
as would substantiate the assertion that he had sent
to defendant the considerable amount of money indi-
cated in her testimony. When the hearing resumed the
next day the defendant, with the permission of the
court, returned to the witness stand and thereupon pro-

ceeded to contradict and change the testimony she had given the previous day. She admitted that she had used an assumed name in Florida for herself and her daughter, that she had given a false address in her testimony, that she had in fact been employed throughout most of her stay in Florida and that she had not in fact received financial assistance from her family, as she had earlier testified. Parts of the testimony in the pendente lite proceedings were transcribed and introduced in evidence in the divorce proceedings before the master. The defendant readily admitted on cross-examination before the master that she had given such false testimony and, somewhat amazingly, protested that the fact that she had recanted her testimony the following day cured everything and rehabilitated her as a credible witness and excused her of all guilt or impropriety in having testified falsely. A party who has perjured herself, as this one did, is unworthy of belief. The only evidence offered by the wife to contradict the husband's testimony as to her course of conduct in their apartment was her own testimony and this amounted to simply a bald denial of the testimony of the husband. The crux of the issue before the master, therefore, was to determine who was telling the truth. The master found the husband to be a credible witness and believed him in preference to the wife. Our review of the entire record confirms this belief. It is true that the court must examine the evidence de novo but the judgment of the master upon the question of credibility is entitled to the fullest consideration. This is especially true when his report, as in the present case, presents a searching analysis of the testimony: *Boyles v. Boyles*, 179 Pa. Superior Ct. 184, 116 A. 2d 248; *Rosen v. Rosen*, 183 Pa. Superior Ct. 103, 128 A. 2d 111; *Danna v. Danna*, 187 Pa. Superior Ct. 129, 144 A. 2d 465. The court below had an excellent opportunity to observe these parties in the hearings before

it for alimony pendente lite and counsel fees. That court did not have to rely upon the cold record but could use its own observation of the parties when it adopted the master's report and accepted his recommendation.

The appellant's principal contention, therefore, that a divorce should not be granted on the uncorroborated testimony of the appellee has no application to the facts in the present case.

"To render applicable the rule that a divorce will not be granted upon plaintiff's uncorroborated testimony, it must appear that the plaintiff's testimony was not only contradicted, but shaken by the defendant: Jones v. Jones, 160 Pa. Superior Ct. 358, 51 A. 2d 521; Fogel v. Fogel, 161 Pa. Superior Ct. 361, 54 A. 2d 844; Miln v. Miln, 175 Pa. Superior Ct. 613, 106 A. 2d 862. The case at bar does not present such a situation; nor is the Master's finding as to credibility at variance with the record." *Hansell v. Hansell*, 182 Pa. Superior Ct. 158, 126 A. 2d 509.

The language of Judge Ross in *Miln v. Miln*, 175 Pa. Superior Ct. 613, 106 A. 2d 862, is applicable to the instant case. Judge Ross. said: "Here the record reveals that plaintiff's testimony not only is not 'shaken' by the defendant but, in several important particulars, is strengthened by her testimony."

The appellee was only required to prove his case by clear and satisfactory evidence and there must be a preponderance of the evidence in his favor: *D'Alessandro v. D'Alessandro*, supra.

Decree affirmed.